IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HEATHER C. CAPISTRANO,

       Plaintiff,

                               6:16-CV-02295-PK

                               OPINION AND ORDER

v.

COMMISSIONER,
Social Security,

       Defendant.

PAPAK, Magistrate Judge:

       Plaintiff Heather Capistrano protectively filed this action on December 9, 2016, seeking

judicial review of the Commissioner of Social Security's final decision denying her applications

for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles

II and XVI of the Social Security Act (the "Act").[1]  This court has jurisdiction over Capistrano's

---

      [1]Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket No. 14.

action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). The parties have consented to jurisdiction by U.S. Magistrate Judge in this matter. Docket No. 11.

Capistrano argues that the ALJ erred in (1) assessing the credibility of her symptom allegations; and (2) evaluating the medical opinions of two treating physicians. I have considered the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision is reversed, and this case is remanded for further proceedings.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[2] At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See*

---

[2]Effective March 27, 2017, updates were made to the regulations. Some C.F.R. sections referenced have been renumbered and the citations listed here are the versions of the C.F.R. that were in effect at the time Capistrano requested judicial review.

*Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(iii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-54. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Id.*, *quoting* Social Security Ruling ("SSR") 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one

of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[3] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.9520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the

---

[3] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g). If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id., citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD

Capistrano was born on May 26, 1974. Tr. 67. Capistrano graduated from high school and attended college for one year. Tr. 216. Prior to her amended alleged disability onset date of September 14, 2012 (Tr. 44), Capistrano worked at a daycare and as a cosmetics representative, although neither job constituted past relevant work (Tr. 32, 61).

Capistrano was referred to the Oregon Health Sciences University Rheumatology department, where she was seen by Ajay Wanchu, M.D., on April 11, 2011. Dr. Wanchu diagnosed fibromyalgia based on 14 positive tender points. Tr. 261-62.

On May 13, 2011, Capistrano's treating physician, John Ward, M.D., interpreted a recent CT scan which showed right-sided sacroiliitis. Tr. 319. The doctor felt it was "more the source of her pain." *Id.* Other diagnoses included fibromyalgia, abnormal liver function, depression, hypothyroidism, anxiety disorder, attention deficit disorder, sleep apnea, gestational diabetes, GERD, and external otitis. Tr. 319-20.

Capistrano was evaluated by rheumatologist Michelle M. Ryan, M.D., in December 2011.

Tr. 482. The doctor noted that Capistrano's pain had worsened 14 months prior, to the extent Capistrano had difficulty walking. Dr. Ryan confirmed the sacroiliitis diagnosis, and indicated it was possible that Capistrano also had psoriatic arthritis. Tr. 485-86.

On March 15, 2013, Capistrano was treated by Patricia O'Hare, M.D. She assessed chronic plaque-like psoriasis with psoriatic arthritis, based on observing 12% of Capistrano's body surface area covered in psoriatic plaques, and feet with fissures. Tr. 457.

Consultative physician, Brandon Markus, D.O., examined Capistrano and produced a report on March 23, 2013. Tr. 452. Dr. Markus diagnosed fibromyalgia based on 14 tender points, and he included psoriatic arthritis as a diagnosis, although there were no objective findings. Tr. 456. Dr. Markus opined that Capistrano could stand/walk for six hours in a workday with frequent position changes, she could lift 50 pounds occasionally and 25 pounds frequently. *Id.*

By February 2014, Capistrano had increased pain and anxiety symptoms, in conjunction with the death of her mother and, shortly thereafter, a divorce from her husband. Tr. 495.

In March 2014, Dr. Ryan reported that Humira was not helpful in treating Capistrano's psoriatic arthritis, but the medication Enbrel seemed to help somewhat. Tr. 470. Capistrano was observed to have "very deep cracking" over the plantar area of her feet. Tr. 469. Dr. Ryan additionally noted Capistrano was getting two Enbrel injections per month to treat her sacroiliitis until her health insurance ran out. Tr. 467.

Capistrano began treatment at Corvallis Pain Management in December 2014. Tr. 522. She received a steroid injection to treat sacroiliiac joint pain in February 16, 2015, which was reported to be 50% helpful in relieving pain. Tr. 516-17. In March 2015, Capistrano was

discharged from the clinic for aberrant behaviors including taking non-prescribed medication, discontinued prescriptions, and not attending a pill count meeting. Tr. 513.

Dr. Ward, in May 2015, noted that Capistrano had stopped taking her pain medications in favor of taking hemp oil. Tr. 541. Significant improved pain control was noted. *Id.*

Dr. Ryan completed a functional capacity questionnaire in June 2015. Tr. 551-55. The doctor noted the diagnoses of psoriatic arthritis and fibromyalgia, for which she had been seeing Capistrano three to four times per year for three years. Tr. 551. The doctor opined that Capistrano's significant pain and fatigue symptoms could not be explained by psoriatic arthritis alone, attributing the excess pain to fibromyalgia. Tr. 552. The doctor indicated that Capistrano must lie down and rest periodically for one to two hours. *Id.* Dr. Ryan further indicated Capistrano could sit for 60 minutes at a time for six hours per day, but she could only stand/walk for five minutes at a time for a total of one hour per day. Tr. 553. She further felt Capistrano would require unscheduled breaks throughout the day, and could only occasionally lift ten pounds. Tr. 554. Dr. Ryan also opined that Capistrano would likely miss more than four workdays per month due to her impairments. Tr. 555.

Dr. Ward completed an identical functional capacity questionnaire in June 2015. Tr. 557-561. The doctor indicated he had seen Capistrano for 11 years, four times per year. His diagnoses were psoriatic arthropathy and fibromyalgia. Tr. 557. Dr. Ward opined that Capistrano needed to rest one hour, twice per day. Tr. 558. The doctor assessed that Capistrano could sit for 60 minutes at a time, four hours per day, and that she could stand/walk for 30 minutes at a time, for one hour per day. Tr. 559. Dr. Ward indicated Capistrano would require unscheduled breaks every hour, and that she could occasionally lift ten pounds. Tr. 560. He too

felt Capistrano would miss more than four workdays each month. Tr. 561.

The last chart notes of record are from a treatment visits with Dr. Ward in August and October of 2015. Capistrano reported she was not taking narcotic pain medications in favor of hemp oil, and was having "more intense pain, really uncomfortable for 4 or 5 days." Tr. 563. Capistrano reported that her anxiety was improved. Tr. 565. In October 2015, Capistrano reported to Dr. Ward that she had increased low back pain, which was significantly limiting her functional abilities. *Id.*

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the ALJ found that Capistrano had not engaged in substantial gainful activity since September 14, 2012, the alleged onset date. Tr. 23. The ALJ therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Capistrano's medical impairments of "obesity, fibromyalgia, and psoriatic arthritis were "severe" for purposes of the Act. *Id.* Because the impairments caused by Capistrano's conditions were deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Capistrano's impairments were the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1. *Id.* The ALJ therefore determined that Capistrano retained the following RFC:

> [C]laimant has the [RFC] to perform light work . . . she can lift 20 pounds occasionally and 10 pounds frequently . . . can stand/walk for six hours in an eight-hour workday and can sit for six hours in an eight-hour workday . . . can occasionally climb ramps and stairs . . . can never climb ladders, ropes, or scaffolds . . . can occasionally balance, stoop, crouch, crawl, and kneel . . . can perform simple routine tasks . . . must alternate positions from sitting to standing every thirty to forty minutes."

Tr. 25-26.

At the fourth step, the ALJ found Capistrano did not have any past relevant work. Tr. 32. The ALJ therefore proceeded to step five.

At the fifth step, the ALJ found that, considering Capistrano's age, education, work experience, and RFC, she could perform jobs that existed in significant numbers in the national economy, such as: assembler, printed products; garment folder; and clerical sorter. Tr. 33.

Accordingly, the ALJ concluded that Capistrano had not been under a disability from the alleged onset date, September 14, 2012, through the date of the ALJ's decision, August 27, 2015. Tr. 33-34.

Capistrano timely requested review of the ALJ's decision, and the Appeals Council denied her request on January 12, 2017. Tr. 1-3. The ALJ's decision of August 27, 2015 thus became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## ANALYSIS

Capistrano argues that the ALJ: (1) failed to provide legally-sufficient rationales to discredit her symptom testimony; and (2) failed to provide legally-sufficient rationales to reject the opinions of two treating medical sources.

## I.    Symptom Allegation Credibility

The Ninth Circuit established two requirements for a claimant to present credible symptom testimony: the claimant must produce objective medical evidence of an impairment or impairments; and must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir.

Page 10 - OPINION AND ORDER

1986). The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity. *Smolen,* 80 F.3d at 1284.

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, the ALJ can reject the claimant's testimony only if the ALJ provides clear and convincing reasons for doing so. *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007). General assertions that the claimant's testimony is not credible are insufficient. *Id.* The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (*citing Lester,* 81 F.3d at 834). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir, 1995) (internal citation omitted). However, even if not all of the ALJ's findings for discrediting symptom allegations are upheld, the overall decision may still be upheld, assuming the ALJ provided other valid rationales. *Batson,* 359 F.3d at 1197.

Capistrano alleged that she was unable to work due to pain in her lower back. She explained that her pain severely limits her ability to stand or walk for extended periods of time. She also endorsed the need to lie down and rest several times each day due to pain and fatigue. Tr. 47-48. She indicated she ingested cannabis oil every three hours for pain. Tr. 49. Although Capistrano previously saw a counselor for anxiety, she explained that she no longer goes because she "just felt like [she] had resolved some of the issues." *Id.* Capistrano explained that she is a single mother of five children, and that her children assist her with household chores such as cooking and cleaning, as well as grocery shopping. Tr. 50-52. She indicated that she takes breaks throughout these activities. Tr. 52. Capistrano testified that on bad days, she has difficulty putting any weight on her legs because

her sacroiliiac joint becomes too painful, and that she has utilized a wheelchair in the past to deal with such flare-ups. Tr. 58-59. The ALJ determined that Capistrano's pain allegations were not fully credible for several reasons. Tr. 29.

First, the ALJ found that Capistrano's discharge from her pain clinic for "aberrant behaviors" undermined her credibility. Specifically, the pain clinic indicated that on one occasion, Capistrano was called in for a pill count and a drug screening, but failed to show up. Tr. 28-29, 503. The pain clinic further indicated that Capistrano had violated other clinic policies in the past, including failing to follow her prescribed medication regimen on at least three other occasions. Tr. 29, 513. The ALJ found that Capistrano was not forthcoming about the circumstances of her discharge from the pain clinic, telling Dr. Ward that she had been discharged due to "a misunderstanding," and telling Dr. Ryan she "did not have a very good experience," and the pain clinic "was not helpful." Tr. 29, 540, 547. The ALJ concluded that contrary to Capistrano's representations to her doctors which portrayed the pain clinic in a negative light, it was "clear that the claimant was dismissed because of misusing medications and refusing a urine test." Tr. 29. The ALJ therefore concluded that Capistrano's overall credibility was "greatly undermined." Tr. 30.

The Ninth Circuit has held that making inconsistent statements about drug use is a clear and convincing reason to impugn a claimant's credibility. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted). Capistrano contends that the ALJ's finding was not appropriate because her violation of the pain clinic's protocols evinced poor judgment and ongoing pain. Be that as it may, the ALJ's finding was specific, and based on substantial evidence of record; although Capistrano has a different interpretation of the record, the Court is compelled to affirm the ALJ's reasonable determination in this circumstance. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)

(variable interpretations of the evidence are insignificant if the ALJ's is reasonable). Capistrano further contends that drug-seeking behavior alone is not sufficient to justify an adverse credibility determination.[4] The argument is inapposite, however, because the ALJ provided additional justifications, as discussed below.

Second, the ALJ impugned Capistrano's credibility based on her work history, finding it did "not suggest the claimant [wa]s motivated to work consistently." Tr. 29. The ALJ noted, for example, that Capistrano had not worked regularly since 2000, twelve years before her alleged onset date. *Id.* The ALJ further found that Capistrano's only job searching efforts were related to TANF[5] benefits requirements. *Id.* An ALJ's determination that "an extremely poor work history" showing "little propensity to work" over time is a clear and convincing factor which may undermine symptom allegations. 20 C.F.R. § 416.929; *Thomas*, 278 F.3d at 959.

Capistrano argues the finding was erroneous because she should not be penalized for years spent raising her children at home, and also because she was unable to work due to her impairments. The ALJ, however, acknowledged that Capistrano had five children; indeed, the ALJ noted that Capistrano was very involved in her children's lives, including attending parent-teacher conferences, sports events, and household activities and care. Tr. 29-30. When the ALJ asked Capistrano about her limited work history, however, she did not identify caring for her children as a factor, explaining instead that after 2000, she was too weak to perform her prior job. Tr. 46-47. Accordingly, the

---

[4]Capistrano cites SSR 16-3p, 2016 SSR LEXIS 4 (March 16, 2016) in support. Although the argument fails because the ALJ provided other reasons to accord diminished weight to Capistrano's symptom testimony, the Court also notes that SSR 16-3p was not in effect at the time of the ALJ's decision.

[5]Temporary Assistance for Needy Families, Title IV of the Act.

instant facts are distinguishable from those of the case cited by Capistrano, *Aichele v. Astrue*, 2010 WL 1849009, at *6 (E.D. Wash. 2010 April 30, 2010) (ALJ erred in finding limited work history where plaintiff explained she did not work in order to care for her young children). Further, contrary to the determination in *Barron v. Berryhiill*, 2017 WL 1054185, at * 7 (C.D. Cal Mar. 20, 2017), the ALJ here did not make a "vague reference" to spotty work history, but found that Capistrano only ever applied for other work in order to receive TANF benefits. Tr. 29, 47. Again, although Capistrano offers a different interpretation of the record, the ALJ's finding is affirmed because it was specific, clear, and convincing. *Burch*, 400 F.3d at 679.

Third, the ALJ found Capistrano's credibility was undermined by the medical record, which suggested she was not as limited as alleged. Tr. 30. The ALJ explained that although Capistrano testified that she needed to use a wheelchair for extended periods in the past, there is no evidence in the record of a wheelchair being used, prescribed or recommended by a provider. Tr. 30. The record demonstrates, however, that contrary to the ALJ's finding, Capistrano previously reported using a wheelchair. Tr. 332, 452, 482. Although the ALJ was nevertheless accurate in finding that no wheelchair was ever prescribed or recommended, it is unclear why the finding is probative of Capistrano's veracity. There does not appear to be any dispute that Capistrano has pain, or that her pain is subject to flares; indeed, the ALJ chose not to give full weight to examining and reviewing sources because they did not account for her pain flares. Tr. 31-32. Further, Capistrano never testified that the wheelchair was prescribed to her, or that she always required a wheelchair. Tr. 59. Rather, she stated that she has used a wheelchair in the past when experiencing significant pain flares. *Id.* The ALJ also implied that wheelchair use was inconsistent with Capistrano's doctors' suggestions that she exercise, but the point is weak, as her doctors recommended no more than low-impact

therapies that are not inconsistent with Capistrano's own allegations regarding her physical

limitations. *Id.* Finally, the ALJ did not identify what testimony her non-prescribed wheelchair use

purportedly undermined. As such, the finding was not clear and convincing. *See Dodrill*, 12 F.3d at

918 (ALJ must state which pain testimony is not credible and what evidence suggests it is not

credible).

Fourth, the ALJ impugned Capistrano's symptom allegations of pain, fatigue, and anxiety

based on her activities of daily living ("ADLs"). An ALJ may consider ADLs in order to illustrate a

contradiction in symptom testimony or to show that the activities meet the threshold for transferable

work skills. *Orn v. Astrue*, 625, 639 (9th Cir. 2007). The ALJ found that despite testimony that

Capistrano receives extensive help from her older children and their father in household activities, her

function report and treatment providers indicated that she was "very active." Tr. 30. Capistrano

explained in her function report that in a typical day, she wakes, readies her children for school, cares

for the home when they are gone, assists with homework when they return, prepares dinner, then puts

the children in bed. Tr. 225. Capistrano also indicated in the function report that when her pain

flares, she requires assistance in personal care, that she must prepare meals ahead of time and freeze

them in anticipation of flares, and she requires help changing loads of laundry and vacuuming. Tr.

226-27. At the hearing, Capistrano's testimony was substantially similar—she explained that her

oldest daughter helps her prepare meals, that she rarely goes shopping because her son can assist with

that task, and that she can perform some housekeeping, but also gets help. Tr. 51-52. Accordingly,

the ALJ erred to the extent he found Capistrano's hearing testimony regarding ADLs contradicted the

level of impairment due to pain reported in her function report. The finding cannot be upheld.

Fifth, the ALJ found that Capistrano's pain complaints exceeded her psoriatic arthritis

symptoms, which illustrated her "high motivation to seek disability benefits." Tr. 30. The finding

was erroneous for two reasons. First, every applicant that seeks disability benefits under the Act is

motivated by an award; because of the length of the process, an applicant that has repeatedly appealed

denials over a period of years is assuredly highly motivated to receive benefits. That a claimant

wished to receive benefits is not, in and of itself, a clear and convincing reason to discredit symptom

allegations. *See, e.g., Ratto v. Sec'y, Dept. Of Health and Human Servs.*, 839 F. Supp. 1415, 1428-29

(D. Or. Aug. 13, 1993). Moreover, the observation cited by the ALJ does not suggest that Capistrano

was exaggerating her symptoms, when read in context. Dr. Ryan was clearly stating that because

Capistrano's pain and fatigue complaints were out of proportion to her psoriatic arthritis diagnosis

alone, the doctor felt that the residual pain was "fibromyalgia related." Tr. 552. Contrary to the

ALJ's finding, however, it is apparent that Dr. Ryan was not suggesting that Capistrano's sacroiliitis

was not as severe as alleged. *Id.* The ALJ also noted that Dr. Ryan did little testing for fibromyalgia

and "appears to have simply adopted [Capistrano's] reports of a fibromyalgia diagnosis." Tr. 30. It is

unclear what the probative value of this finding is, however, because Dr. Ryan was not alone in

diagnosing fibromyalgia: in fact, *every* medical source of record listed fibromyalgia as a contributory

diagnosis, and the ALJ determined fibromyalgia was a severe impairment at step two. Tr. 71, 82,

262, 273, 452, 551, 557. The ALJ's reasoning was erroneous.

In determining whether to uphold an ALJ's overall credibility assessment, the "key question is

not whether there is substantial evidence that could support a finding of disability, but whether there is

substantial evidence to support the Commissioner's actual finding that claimant is not disabled."

*Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997). Here, although several of the the ALJ's

rationales did not meet the rigorous clear-and-convincing standard, the ALJ's overall finding must be

upheld based on the legally-valid rationales set forth by the ALJ. *Batson*, 359 F.3d at 1197.

## II.    Medical Source Opinions

Capistrano assigns error to the ALJ's rejection of the medical opinion of two treating physicians, Drs. Ryan and Ward. To reject the uncontroverted opinion of a treating or examining physician, an ALJ must articulate "clear and convincing reasons" for doing so. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-31). If a treating or examining physician's opinion is in conflict with substantial evidence or with another physician's opinion, however, it may be rejected for merely "specific and legitimate reasons." *Id.*

In June 2015, Drs. Ryan and Ward completed functional assessment worksheets that were prepared by Capistrano's attorneys. Both doctors opined that Capistrano had psoriatic arthritis and fibromyalgia. Tr. 551, 557. Both doctors opined that she would need to lie down for at least one hour each day to address pain and fatigue. Tr. 552, 558. Both doctors also opined that Capistrano would be expected to miss more than four workdays per month due to her impairments. Tr. 555, 561. Additionally, the doctors opined that Capistrano was severely limited in the use of her hands and arms in terms of reaching, handling, and fingering, and would require breaks after such use. Tr. 554, 560. The ALJ accorded the opinions little weight. Tr. 31.

Instead, the ALJ accorded weight to Brandon Markus, D.O., who examined Capistrano in March 2013. Dr. Markus identified 14 positive trigger points, consistent with the diagnosis of fibromyalgia, but he noted no objective findings for psoriatic arthritis. Tr. 456. Contrary to the opinions of Drs. Ryan and Ward, Dr. Markus observed normal functioning in his examination of gross and fine motor skills, as well as full motor strength and muscle bulk and tone in the upper and lower extremities, as well as full grip strength bilaterally. Tr. 455. Dr. Markus observed Capistrano

could walk and squat without difficulty, and had a normal gait. Tr. 454. Also in contrast to the treating physicians, Dr. Markus opined that Capistrano could sit for up to six hours with frequent position changes, could life and carry 50 pounds occasionally and 25 pounds frequently, and could reach frequently, but had no limitations in handling, fingering, or feeling. Tr. 456. The ALJ noted that Capistrano may have greater pain at times than she did when she was assessed by Dr. Markus, so he fashioned an RFC for light work. Tr. 30-31. The ALJ also gave weight to the agency reviewing physicians, although he further limited Capistrano to light, rather than medium, work. Tr. 31-32.

Citing *Orn*, Capistrano argues that Dr. Markus' opinion does not conflict with the treating physicians'. In *Orn*, however, the Ninth Circuit determined that an examining doctor's opinion, which was based on the same medical findings as two other doctors but differed in its conclusion, did not alone constitute substantial evidence. *Orn*, 495 F.3d at 633. The case is inapposite because here Dr. Markus performed his own examination, and relied on different findings from those of the treating physicians in presenting his opinion. Accordingly, because there was a conflict in the medical opinion evidence, the specific-and-legitimate legal standard applies.

A. *Dr. Ryan*

The ALJ provided several reasons for giving little weight to Dr. Ryan's opinion. The ALJ found that the level of dysfunction endorsed by Dr. Ryan was inconsistent with her examination findings, in which she reported normal range of motion and "only" tenderness to palpation. Tr. 31. Accordingly, the ALJ asserted that the doctor's opinion must have been based on Capistrano's subjective complaints. *Id.* Capistrano argues that although Dr. Ryan noted some improvement with Enbrel injections to treat Capistrano's psoriatic arthritis with associated sacroiliitis in February 2014, she continued to have "out of control" pain in May 2014, even though she had no objective joint

synovitis (inflammation). Tr. 462. The Commissioner argues that Capistrano's examination were generally benign, and despite the fact that Dr. Ryan regularly made note of Capistrano's pain complaints, her opinion was properly rejected because it was unsupported by objective medical findings.

However, the ALJ's analysis was inadequate. As the Ninth Circuit recently reiterated:

> "[f]ibromyalgia is diagnosed entirely on the basis of patients' reports of pain and other symptoms, and there are no laboratory tests to confirm the diagnosis. Pursuant to SSR 12-2p, tender-point examinations themselves constitute objective medical evidence of fibromyalgia. Moreover, the symptoms of fibromyalgia wax and wane, and a person may have good days and bad days.

*Revels v. Berryhill*, 874 F.3d 648, 663 (9th Cir. 2017), *citing Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004); SSR 12-2p, 2012 SSR LEXIS 1 (July 25, 2012) (internal citations and quotation marks omitted). The *Revels* court admonished that the ALJ in that case "failed to properly analyze Revels' fibromyalgia-related symptoms pursuant to SSR 12-2p . . . and our court's opinion in *Benecke v. Barnhart*. This appears to be a recurrent problem." *Revels*, 847 F.3d at 662. As is the case here, the ALJ in *Revels* erroneously rejected the opinion of a treating rheumatologist because his opinion did not provide an adequate discussion of how the doctor determined Revels' functional limitations. The Ninth Circuit, considering the applicable case law and SSR 12-2p, reversed, noting the doctor's accounts of Revels' pain complaints, his own examination findings of tender points, and a longitudinal history of medical evidence of fibromyalgia. *Id.* At 663. There are certainly similarities to the facts and ALJ's findings in the instant matter: for example, Revels' doctor's opinion was rejected, in part, because at some appointments, he observed a normal range of motion with no synovitis. *Id.* at 658, 663. The ALJ in the instant case rejected Dr. Ryan, in part, for that very reason. Tr. 28, 30. However, the *Revels* court found error with the finding because "a person with

fibromyalgia may have muscle strength, sensory functions, and reflexes that are normal." *Id.* (citation and internal quotation marks and brackets omitted). Moreover, in contrast to the plaintiff in *Revels*, Capistrano demonstrated fibromyalgia tender points consistently: they were repeatedly recorded by Drs. Ryan and Ward, and also by the examining physician, Dr. Markus. Accordingly, Ninth Circuit precedent directs that the ALJ's first rationale for rejecting Dr. Ryan's opinion did not meet the specific-and-legitimate threshold.

The ALJ also rejected Dr. Ryan's opinion because the doctor suggested that Capistrano exercise more, and she only treated Capistrano three to four times per year. Tr. 31, 461. The ALJ's finding regarding exercise is not specific and legitimate: the mere fact that a doctor suggested or prescribed low-impact exercise therapy in the context of fibromyalgia symptoms does not, in and of itself, preclude a finding that those symptoms are disabling. *See, e.g., Benecke*, 379 F.3d at 591, 594 (noting treating physician prescribed aquatic exercise therapy, and crediting the physician's opinion that Benecke was disabled as true). The ALJ's finding that Dr. Ryan did not treat Capistrano frequently enough "to know how she will function on a regular day or day to day basis," is not a reasonable finding in light of according greater weight to examining physician Dr. Markus, who saw Capistrano for a total of 28 minutes, and the reviewing physicians, who never saw or examined her at all. Moreover, Dr. Ryan treated Capistrano for more than three years, and as a rheumatologist, should generally be accorded greater weight than non-specialist physicians. 20 C.F.R. § 416.927(c)(5). Thus, both of the ALJ's rationales for dismissing Dr. Ryan's opinion were erroneous.

B. *Dr. Ward*

The ALJ provided similar reasons for rejecting Dr. Ward's opinion. For example, the ALJ noted that Dr. Ward only treated Capistrano four times per year, so was not in a position to gauge her

daily functioning. Tr. 32. The ALJ's finding is clearly erroneous, however, because the ALJ simply ignored the fact that Dr. Ward was Capistrano's primary treating physician for more than ten years at the time he rendered his medical opinion. Tr. 557. Moreover, as noted above, it is unreasonable to discredit a provider for the reason he treated a claimant "only" four times per year over the course of many years in favor of one physician who provided a single examination and two other physicians who merely reviewed a portion of the medical record, without the benefit of an in-person meeting.

The ALJ also accorded little weight to Dr. Ward's assessment because "[m]uch of her [sic] opinion appears to be based on the claimant's reports of pain, which are found to be less than credible." Tr. 32. As above, in the context of fibromyalgia, it is not uncommon for there to be few objective measures of a claimant's experience of pain. *Supra.* Necessarily, then, a treating medical source must rely to a degree on their patient's subjective reports to determine levels of treatment, and in the context of a medical opinion offered in support of an application for benefits under the Act, levels of functional impairment. Here, although the Court finds that the ALJ's credibility evaluation of Capistrano must be affirmed based on a number of valid findings by the ALJ, it does not necessarily follow that Capistrano's symptom allegations are untrue, or that Dr. Ward's opinions was based on allegations that are not credible.

For example, based on Ninth Circuit precedent, the ALJ did not err to find Capistrano's pain allegations were undermined to a degree because of her discharge from the pain clinic, and her poor work history and testimony about only attempting to work because it was required of her in order to receive TANF benefits. *Supra.* However, neither of those reasons appear to be strongly applicable to the propriety of Dr. Ward's opinion. Rather, Dr. Ward indicated that his opinion was based on ongoing symptoms of multiple joint pains, fatigue, muscle pain, and weakness. Tr. 558. He

described the applicable signs: elevated inflammatory markers, and joint inflammation on imagery. *Id.*

Although the Commissioner argues that Capistrano did not demonstrate gross deformity in her lumbar spine or significant pain with palpation in 2013, she does not allege disability based on any spine condition, and as mentioned above, fibromyalgia symptoms may wax and wane. *Revels*, 874 F.3d at 663. Again, particularly in the context of fibromyalgia, the occasional absence of compelling objective findings on examination do not suggest that Capistrano's pain complaints are exaggerated. *See* SSR 12-2p ("symptoms and signs of fibromyalgia may vary in severity over time and may even be absent on some days[.]"). In such circumstances, the ALJ is tasked with considering other evidence, including ADLs and medications. Here, although the ALJ's overarching credibility determination was valid, the ALJ failed to provide sufficient rationales regarding why Capistrano's ADLs were inconsistent with her pain reports. *Supra.* Further, although the ALJ properly impugned Capistrano's credibility pursuant to SSR 96-7p based on her misuse of pain medications, there is little doubt that her pain continued and was significant. In fact, the ALJ made that express finding in limiting the weight he accorded to the examining and reviewing sources. *See* Tr. 31 ("[Capistrano] appeared to be in pretty good shape during this examination, but has reported more pain at other times, so the undersigned limits her to light work"), 32 ("the more recent evidence indicates that the claimant continues to have some pain from her psoriatic arthritis").

For these reasons, the rationales proffered by the ALJ to discredit the opinions of Capistrano's treating physicians were not specific-and-legitimate. Remand is therefore appropriate.

## III.    RFC and Step Five

Capistrano separately assigns error to the RFC formulation, and the step five finding based

thereon. However, Capistrano's arguments are merely cumulative of the prior discussion of her credibility assessment and the evaluation of the medical opinions of Drs. Ryan and Ward. Because remand is required in order to reevaluate those sources, the Court does not reach the issues of the errors assigned to the RFC or step five findings.

## IV.    Remand

For the reasons discussed herein, the ALJ's decision did not provide legally sufficient reasons to reject the opinions of two treating medical sources. Accordingly, the sole remaining issue is to determine whether to remand for further proceedings or for immediate payment of benefits. The decision to remand for further proceedings turns upon the likely utility of such proceedings. *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000). While the typical course is to remand for further proceedings, the Ninth Circuit has credited evidence as true when the ALJ failed to provide clear and convincing reasons for discounting the testimony of a plaintiff or a medical provider. *See, e.g., Garrison*, 759 F.3d at 1022-23; *Orn*, 495 F.3d at 640; *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004). A court "should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits" when the follow conditions are met: "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are not outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the [plaintiff] disabled were such evidence credited." *Benecke*, 379 F.3d at 593.

The first prong of the credit-as-true test is met by virtue of the ALJ's errors in evaluating the medical opinions of Drs. Ryan and Ward. The second prong of the analysis is not met, however, because outstanding issues remain. Critically, the ALJ provided legally sufficient reasoning to

support his finding that plaintiff's allegations were not fully credible. Although the credibility finding was not without error, Ninth Circuit case law and the operative guidance at the time of the decision direct that the errors were harmless. *Supra.* Nonetheless, the record reflects inconsistencies that remain unresolved: for example, Capistrano appeared to improve after she stopped taking narcotic pain medication in 2015, which appears inconsistent with her allegations of disabling pain *despite* narcotic pain medication before. Tr. 562. On the other hand, the ALJ's errors in evaluating the treating medical source opinions constitute reversible error, in part because the ALJ did not properly evaluate Capistrano's fibromyalgia under SSR 12-2p and precedential case law. Based on this glaring inconsistency, the proper remedy is to remand for further proceedings.

In a subsequent decision, the ALJ must provide a proper analysis of the treating medical opinions, considering the implications of SSR 12-2p and the record as a whole. Following a proper analysis of the medical source opinions—including, if necessary, seeking further input from a consultative examiner who has expertise in rheumatology and has reviewed the entire record—an ALJ on remand will be in the proper position to craft a new RFC and proceed with the sequential analysis. Thus, because further proceedings are needed, the Court does not reach the third prong of the credit-as-true inquiry. *Treichler v. Colvin*, 775 F.3d 1090, 1105 (9th Cir. 2014) (remand is appropriate where ALJ erred in making adequate findings to support key conclusions, but it is plausible that such conclusions could be supported). Furthermore, remand for reconsideration is appropriate where, as here, the ALJ's adverse credibility finding is upheld. *Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2017) (remanding for further proceedings rather than benefits based, in part, on ALJ's affirmed credibility finding); *see also Leon v. Berryhill*, 880 F.3d 1041, 1048 (9th Cir. 2017) (remanding for further proceedings because although the ALJ's credibility finding was

erroneous, the ALJ's other findings were upheld).

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Capistrano's application for supplemental security income[6] is reversed and remanded for further proceedings.

Dated this 3rd day of May, 2018.

Honorable Paul Papak
United States Magistrate Judge

---

[6]At the hearing, Capistrano amended her onset date to December 14, 2012. Tr. 44. Because Capistrano's date last insured was December 31, 2003, the amendment precluded her application for DIB. *See* Tr. 20-21, 66.